Filed 9/26/13  P. v. Escobar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037393 |
| Plaintiff and Respondent, | (Santa Cruz County<br>Super. Ct. Nos. WF00999, WF01021) |
| v. | |
| JULIAN ESCOBAR, | |
| Defendant and Appellant. | |

A jury convicted defendant Julian Escobar of first degree murder and found true a special-circumstance allegation for purposes of a life-without-parole sentence (committed murder while an active participant in a criminal street gang and murder was carried out to further activities of the street gang--Pen. Code, § 190.2, subd. (a)(22)).[1]  It also convicted him of four counts of attempted premeditated murder, one count of active participation in a criminal street gang, and found true (as to the murder and attempted-murder counts) sentence-enhancement allegations that he personally discharged a firearm causing death and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang.  Defendant also admitted allegations that he had suffered prior convictions for purposes of the Three Strikes law and other sentence enhancements.  The trial court sentenced defendant to an indeterminate term of life without the possibility of parole for the murder conviction, consecutive indeterminate terms of 25-years-to-life with the possibility of parole for the attempted murder convictions, and a determinate

_____
[1] Further unspecified statutory references are to the Penal Code.

term of six years for the gang-participation conviction. It stayed the sentence enhancements. On appeal, defendant contends that (1) the trial court erred by overruling his objections to the admission of evidence about his criminal history, (2) the trial court erred by overruling his hearsay objection to the admission of evidence about his wife's statements to the police, (3) the trial court erred by overruling his objection to the admission of evidence about text messages between him and his wife, (4) the prosecutor engaged in misconduct by eliciting from witnesses that it was known on the street that he was the killer, (5) the trial court erred by imposing a suspended parole-revocation fine, and (6) the trial court erred by failing to denote that a restitution fine was a joint and several liability shared by his codefendant.[2] He interweaves claims of ineffective assistance of counsel in the event certain contentions are procedurally barred. We affirm the judgment.

### BACKGROUND

At 2:00 a.m. on March 21, 2009, defendant's brother, Michael, was shot at a party hosted in Watsonville by members of the Varrio Green Valley gang (VGV), a Watsonville subset of the Norteno criminal street gang. Defendant and Michael were members of the East Las Casitas gang (ELC), a Salinas subset of the Norteno gang. Michael was taken to Stanford Hospital where he underwent vascular surgery that was completed at approximately 4:00 p.m.

On the afternoon of March 21, 2009, Angel Escobedo, Sonny Escobedo, Rene Lara, Jesse Nieto, and Marshall Hernandez were playing basketball at the Apple Hill apartment complex in Watsonville. Defendant and Jose Sandoval aggressively approached the group and asked whether any players were gang members. After denials, defendant and Sandoval walked away. Defendant shortly returned with his hands in his

---

[2] Defendant raised a custody-credit issue but has informed us that the trial court has corrected the error.

2

pockets and demanded to know where the players were from. He pulled out a revolver from his pocket, and the players began running away. Defendant shot at the group four to six times. Two bullets hit and killed Angel Escobedo.

The police investigation began with the gathering of several descriptions of defendant and Sandoval. It then focused on the Poor Side Sureno gang in Watsonville. But, on January 20, 2010, defendant's wife, Monique Rodriguez, called the police and offered to talk about the killing of the basketball player in Green Valley. During her interview, she implicated defendant. Sonny Escobedo, Nieto, and Lara then identified defendant from a photo lineup.

The issue at trial was identity. Sonny Escobedo, Nieto, and Lara identified defendant. Defendant's grandmother testified that defendant was with her all day visiting Michael at Stanford Hospital. Defendant's cousin testified that he saw defendant at the hospital at 9:00 a.m. and 12:45 p.m. The doctor who performed Michael's surgery testified that he did not recall seeing defendant when he went to speak with Michael's family after the operation at 4:00 p.m.

### EVIDENCE ABOUT DEFENDANT'S CRIMINAL HISTORY

Defendant contends that the trial court abused its discretion by admitting criminal-history evidence over his objection grounded on Evidence Code section 352 (exclusion of evidence if probative value is substantially outweighed by probability that admission will necessitate undue prejudice). He specifies the following evidence, most of it proffered by the People during in limine proceedings to prove the gang special circumstance, the gang allegations, the gang participation count, and defendant's gang-retaliation motive, as well as to explain certain witnesses' fears.

1. In 1997, when defendant was 12 years old and while possessing a cement-filled bat, defendant showed his tattoos to a Salinas police officer and told the officer that he had been a Norteno gang member for three or four years.

3

2. In 2001, when he was living in Chicago, defendant possessed a .38-caliber revolver and told a police officer that he was a member of the Latin Kings gang.

3. In 2002, when defendant was in juvenile hall, defendant said to the juvenile hall staff, "If I had my .38 special, you would be dead."

4. In 2005, when defendant was in a car with his wife and stopped by the police who were investigating a shooting, defendant's wife told a police officer that she had earlier heard shots and defendant had then run back to the car and yelled at her to "Go, go, go" or "Drive, drive, drive."

5. In 2005, when defendant was in a car with his wife and stopped by the police, defendant ran away, "removed a firearm from his waistband and pointed it at officers." He admitted to the officers that he was a Norteno. As a result of the incident, he was convicted of brandishing a firearm at a peace officer and active participation in a street gang. He was sentenced to four years in prison.

6. In 2006, when defendant was in prison, he attacked and seriously injured his Norteno cellmate with a nail.

7. The People's gang expert opined that a filled-in teardrop tattoo signified that the wearer had murdered on the gang's behalf. Defendant had a teardrop tattoo and witnesses had described the shooter as having a teardrop tattoo.

The admission of gang-affiliation evidence over an Evidence Code section 352 objection is a matter within the trial court's sound discretion, and this decision will not be disturbed on appeal unless the admission of the evidence exceeded the bounds of reason. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.) "A decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citations.] In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not be set aside on review." (*People*

4

*v. Preyer* (1985) 164 Cal.App.3d 568, 573-574.)  This rule requires that the reviewing court engage in all intendments and presumptions in support of the decision and consider the evidence in a light most favorable to the prevailing party.  (*People v. Condley* (1977) 69 Cal.App.3d 999, 1015.)  It also requires that the party claiming abuse of discretion affirmatively establish the point.  (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958.)

There is no bright-line rule for the admissibility of gang affiliation evidence; the question is usually fact-specific and, as such, peculiarly one for the trial court's discretion.  Our task is simply to determine whether the trial court could have rationally concluded that the probative value of the evidence outweighed the prejudicial effect.  (See, e.g., *People v. Hill* (2011) 191 Cal.App.4th 1104, 1139 [there is no "artificial limit of seven (or fewer) predicate offenses to prove the gang enhancement"].)

According to defendant, "The admission of this sheer volume of evidence concerning [his] criminal history, much of it highly prejudicial, constituted error" because "all of these matters were more than adequately established by other far less prejudicial evidence which was admitted at [his] trial in addition to the evidence at issue."  He points out that his gang affiliation "was easily established by his possession of gang tattoos, the gang writings found in his home and [his] repeated admissions to police officers and jailers that he was an active ELC gang member."  He adds that "there was strong and undisputed evidence that the . . . shooting had been committed for the purpose of advancing and benefitting a criminal street gang and, if [he] had been involved in the shooting, he had done so for gang purposes."  He notes that there was no challenge to the gang expert's opinion that, if he had committed the shooting, the shooting "had been motivated by the gang-related motive of retaliating for the earlier shooting of his brother."  He poses that the gang experts "were certainly in a position to discuss the fears and concerns of eyewitnesses in gang prosecutions without any reference to [his] past crimes."  And he argues that the probative value of the incidents connecting him to a .38-caliber revolver was little given that the Escobar murder weapon was not found and the

5

People's expert had opined that the murder weapon could have been a 9-millimeter, .38-caliber, or .357-caliber gun. "In sum, the matters which the prosecutor cited as justifying the admission of the criminal history evidence--proof of [his] ELC gang membership, explaining the fears of some witnesses, proof of [his] gang-related motive for the shooting, and proof of the gang special circumstance and the . . . gang allegations--were easily and overwhelmingly established by the other evidence introduced at trial and, moreover, were matters not even in dispute by [his] counsel. The only actually disputed issue at [his] trial was the identity of the shooter and it was uncontested that, if [he] had been the shooter, he had acted for gang-related motives and purposes. It thus constituted error for the court to permit the prosecution to introduce extensive evidence of [his] past criminal history for purposes of 'proving' matters which were otherwise well established and not even in dispute." Defendant concludes: "[P]rinciples of constitutional due process and Evidence Code section 352 weighed strongly in favor of excluding all or most of the evidence concerning [his] criminal history."

As is apparent, defendant manifestly fails to carry his appellate burden. He merely reargues his position rather than focuses on the factors supporting the trial court's decision and explains why it was irrational to rely on those factors.

In any event, it was not irrational for the trial court to conclude that the gang evidence had substantial probative value. A prosecutor is generally entitled to tell his or her story with the most persuasive and forceful evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 16-17.) " 'Evidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 669.)

Here, the trial court could have rationally concluded that the evidence about defendant's criminal history had greater evidentiary weight than the evidence highlighted by defendant, such as defendant's undisputed gang affiliation, gang tattoos, and the like. Indeed, the evidence linking defendant to .38-caliber guns had evidentiary weight apart

6

from its gang significance in the sense that it suggested defendant's affinity for a possible murder weapon. And the evidence about defendant's attack on his Norteno cellmate was relevant to explain the gang expert's opinion that Norteno-upon-Norteno violence was possible and, thus, defendant could be motivated to murder another perceived Norteno (Escobedo).

As to the prejudice prong, " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) In other words, "Evidence Code section 352 is designed for situations in which evidence of little evidentiary impact evokes an emotional [prejudice]." (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1369.)

But whether evidence is so outrageous so as to shock the emotions of a jury into using the evidence improperly is a highly subjective determination. In the ordinary case such as this one, the question provokes a difference of opinion rather than exposes irrationality, as defendant implicitly concedes by opining that legal principles "weighed strongly in favor of excluding all or most of the evidence." Here, the trial court could have rationally concluded that the criminal-history evidence had enough probative value as to outweigh any emotional prejudice or that any emotional prejudice from the evidence was negligible in light of the limiting instructions given in the case.[3] It could also have

---

[3] After the People's gang expert testified about the significance of the criminal-history evidence, the trial court instructed the jury in the language of CALCRIM No. 1403 as follows: "Evidence has been introduced for the purpose of showing criminal street gang activity and criminal acts by gang members other than the crimes that are charged in this case for which the defendants are presently on trial. [¶] This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] It may be considered by you (continued)

7

rationally concluded, for example, that the possible prejudicial effect of the connection between being a murderer and the teardrop tattoo was ameliorated when the People's other gang expert contradicted that evidence and testified on defendant's cross-examination that "there really isn't a documented significance" and the tattoo could signify several things including the "remembrance of a loved one who is dead."[4]

Similarly, defendant's general complaint about the "sheer volume" of evidence does not demonstrate an abuse of discretion. In *People v. Hill*, *supra*, 191 Cal.App.4th at pages 1137-1139, the court "approved the introduction of eight predicate offenses to establish the gang-benefit allegation. Conversely, one reviewing court found marginal evidence bearing on this allegation to be insufficient to establish its truth [citations], which could have made the prosecution leery of introducing too little evidence about predicate crimes. The statute speaks of a 'pattern' and permits the prosecution to introduce evidence of 'two or more' offenses." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)

In sum, the gang-related evidence admitted here was relevant to material issues in this case, and the trial court carefully scrutinized the impact of the evidence. For

---

only for the limited purpose of determining, if it does tend to show, number one, the existence of the intent, purpose, or knowledge that is required to prove the gang-related enhancements which are charged in this case. [¶] Number two, a motive for the commission of the crimes charged in this case. [¶] Number three, that the crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. [¶] Number four, you may also consider the evidence when you evaluate the credibility or the believability of any witness. [¶] Number five, you may also consider this evidence when you consider the facts and the information relied upon by an expert witness in reaching his opinion. [¶] You are not permitted to consider the evidence for any other purpose." And, in instructing the jury at the trial's conclusion, the trial court reiterated the instruction.

[4] Defendant did not object to the teardrop evidence, but he argues that his trial counsel's failure to object to that evidence amounted to ineffective assistance of counsel.

example, as to the Norteno-upon-Norteno-violence issue, the trial court offered that "I'm trying to balance interests here" and defendant concedes that the trial court excluded "the fact that the cellmate was stabbed 25 times; instead the witness could testify 'that it was a severe stabbing.' " The exercise of its discretion was not arbitrary or capricious. Again, defendant has failed to carry his heavy burden to demonstrate an abuse of discretion.

Defendant's constitutional claim fails as well. " '[R]ejection on the merits of a claim that the trial court erred . . . necessarily leads to rejection of the newly applied constitutional "gloss" as well. No separate constitutional discussion is required in such cases, and we therefore provide none.' " (*People v. Rivas*, *supra*, 214 Cal.App.4th at p. 1435.)

### EVIDENCE ABOUT RODRIGUEZ'S STATEMENTS TO THE POLICE

Rodriguez told the police that she had overheard defendant on the telephone, once before the murder and once after the murder. She related that defendant had said in the first call, "they were from Green Valley" and "he was with him that night when it happened." And she reported that defendant had said in the second call, "I took care of it." During in limine motions, Rodriguez refused to testify on the ground of her marital privilege. She nevertheless explained that she had lied to the police about the telephone calls because she was upset that she had contracted a sexually transmitted disease from defendant. The People proffered Rodriguez's statements via a police officer over defendant's hearsay objection. They urged that the evidence was admissible hearsay under the exception for declarations against social interests because, by implicating defendant in a murder, Rodriguez--as a murderer's wife--essentially announced herself as a pariah. In ruling that the evidence would be admitted, the trial court explained that Rodriguez's statements were reliable because (1) they were corroborated by the witnesses who identified defendant from the photo lineup, (2) a wife would not ordinarily "call the police and say her husband had admitted to . . . murder" unless it were true, and (3) Rodriguez had attempted to hide her identity during her initial telephone call to the

9

police. It concluded: "I think it is the kind of statement that would make someone an object of hatred, ridicule, or social disgrace in the community such that you wouldn't say it unless it were true. Imagine diming out your own husband if it were not true. [¶] There are also pecuniary consequences. This is the man who is supposed to be supporting her child, and she, obviously, is aware that if he's incarcerated for homicide, there's not going to be any support, either financial or emotional presence or things of that nature. I just can't find that there would be any reason to say this except for the fact that it's true."

"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected [the declarant] to the risk of civil or criminal liability, or so far tended to render invalid a claim by [the declarant] against another, or created such a risk of making [the declarant] an object of hatred, ridicule, or social disgrace in the community, that a reasonable [person] in [the declarant's] position would not have made the statement unless [the person] believed it to be true." (Evid. Code, § 1230.)

"A party who maintains that an out-of-court statement is admissible under this exception . . . must show that the declarant is unavailable, that the declaration was against the declarant's [social] interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.] To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] On appeal, the trial court's determination on this issue is reviewed for abuse of discretion." (*People v. Cudjo* (1993) 6 Cal.4th 585, 606.)

Defendant argues that the Rodriguez evidence does not meet the reliability test. He asserts: "The [trial] court's reasoning was incorrect because a disgruntled spouse's

10

accusation against his or her mate does not possess any inherent indicia of reliability . . . ."

As before, defendant manifestly fails to carry his appellate burden to demonstrate trial court irrationality. He merely reargues his trial court position. "Arguments should be tailored according to the applicable standard of appellate review." (*Sebago*, *Inc*. *v*. *City of Alameda* (1989) 211 Cal.App.3d 1372, 1388.) Failure to acknowledge the proper scope of review is a concession of a lack of merit. (*James B*. *v*. *Superior Court* (1995) 35 Cal.App.4th 1014, 1021.) " '[I]t is an attempt to place upon the court the burden of discovering without assistance from appellant any weakness in the arguments of the respondent. An appellant is not permitted to evade or shift his [or her] responsibility in this manner.' " (*Paterno v*. *State of California* (1999) 74 Cal.App.4th 68, 102.)

In any event, defendant could not make a convincing argument that the trial court abused its discretion. His entire point rests upon accepting the truth of Rodriguez's in limine testimony to the effect that Rodriguez had lied to the police because she was angry at defendant about his supposed infidelity. But the trial court emphasized that it did not believe Rodriguez: "[I]t's clear to the Court that she's lying to protect her husband. It's clear to the Court that her testimony in court today was not credible, nor reasonable. . . . [O]bviously, she has an extensive motive to assist her husband at this stage in the proceedings." Under the circumstances, it is not irrational to instead believe that Rodriguez's corroborated statements to the police, which risked making Rodriguez an object of social disgrace in the community, were sufficiently reliable for purposes of the declaration against interest exception to the hearsay rule.

Defendant contends that admission of Rodriguez's statements to the police violated his Sixth Amendment right to confrontation as defined by *Crawford v*. *Washington* (2004) 541 U.S. 36. "In *Crawford*, the United States Supreme Court reexamined the application of the Sixth Amendment to the admission of hearsay statements. *Crawford* did not replace a conventional hearsay analysis. Instead, it added a

11

second layer of inquiry when hearsay is offered against a criminal defendant. *Crawford* established, except in circumstances not relevant here, if a hearsay statement is testimonial in nature it cannot be introduced against a criminal defendant unless the declarant is unavailable, and the defendant had a previous opportunity to cross-examine the declarant." (*People v. Blacksher* (2011) 52 Cal.4th 769, 811.)

Defendant, however, did not raise an objection below based on the right to confrontation. He has therefore forfeited the claim. (*People v. Redd* (2010) 48 Cal.4th 691, 730 [no error in admitting evidence over hearsay objection]; see *People v. Loy* (2011) 52 Cal.4th 46, 66 [where there is error in admitting hearsay evidence, defendant may argue that the error also had the consequence of violating the right to confrontation].)

Defendant, alternatively, contends that he received ineffective assistance of counsel because his trial counsel failed to make a *Crawford* objection. He fails, however, to demonstrate ineffective assistance of counsel.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) That right "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*Ibid.*) But the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8.)

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.)

12

An appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.) Therefore, if the defendant does not show that he or she was prejudiced by the purported deficient performance of counsel, the claim can be rejected without deciding whether counsel's performance was actually deficient under the *Strickland* standard. As to the prejudice prong, "[t]he United States Supreme Court [has] explained that this second prong of the *Strickland* test is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " (*In re Harris* (1993) 5 Cal.4th 813, 833.) A defendant must prove prejudice that is a " 'demonstrable reality,' not simply speculation." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Defendant argues that he suffered prejudice because "this was a close case on the question of [his] identity as the gunman." He urges that his identity was problematic because (1) after his first encounter with the group, the victim remarked that he recognized defendant as having been at the Si Se Puede drug rehabilitation center but no evidence suggested that defendant had ever been at the center, (2) several eyewitnesses had "hesitated" when police officers showed them a picture of a Sureno gang dropout who was a former resident of the center with a motive to commit a crime in order to return to the gang's good graces, (3) the eyewitnesses saw the gunman "for a few minutes under stressful conditions" when he was wearing a beanie hiding some of his features, (4) defendant's teardrop tattoo was not unique, (5) there was no evidence of the murder weapon, and (6) defendant presented an alibi defense (he was at Stanford Hospital). Defendant adds that the prosecutor highlighted the erroneously admitted evidence in argument to the jury by stating: "He said on the phone, 'It was Green Valley. He was

13

with him when it happened. It was Green Valley.' [¶] That establishes the motive, it establishes planning, it establishes premeditation, and it shows why he went to Watsonville and why he went somewhere just off Green Valley Road. [¶] And then you have his statement, 'I took care of it,' afterward. [¶] Additional evidence that proves that the defendant was the shooter."

We disagree that defendant has demonstrated prejudice as a demonstrable reality.

No one identified the Sureno suspect or anyone else during the investigation immediately after the murder. But several months later, three eyewitnesses identified defendant from a photograph. They then identified defendant at trial. No reasonable jury would believe that eyewitness' "hesitation" at a suspect's photograph was equivalent to an identification where the eyewitnesses positively identified another. And no reasonable jury would credit defendant's alibi because the only unbiased witness, Michael's doctor, did not see defendant on the afternoon of the murder when he saw the rest of the family. Even defendant's cousin could not place defendant at the hospital past 12:45 p.m. The prosecutor's remarks to the effect that the first telephone call established motive, planning, and premeditation added nothing to the evidence already establishing those issues. (See *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [gang member's retaliation motive supported finding of premeditation]; *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1463-1464 [multiple shots shows planning, preexisting thought, and reflection]; *People v. Manriquez* (2005) 37 Cal.4th 547, 578 [multiple gunshot wounds to the chest supported finding of premeditation].) And the prosecutor acknowledged that the second telephone call was merely additional evidence proving that defendant was the murderer.

We therefore reject defendant's claim of ineffective assistance of counsel.

EVIDENCE OF TEXT MESSAGES BETWEEN DEFENDANT AND RODRIGUEZ

Over defendant's objection grounded on the marital privilege, the trial court admitted evidence of private text messages exchanged between defendant and Rodriguez.

14

As described by defendant, "In those messages, [Rodriguez] told [defendant] that he would not see their children grow up because he was going to 'prison for life.' [Defendant] accused [Rodriguez] of ruining his life by 'calling the cops.' [Rodriguez] and [defendant] agreed that she would have to 'fix' the situation and see that the charges against him were dropped."

On appeal, the People concede that the trial court erred in its reasoning.[5] But they urge that the evidence was nevertheless admissible on the theory that Rodriguez had waived the marital privilege by disclosing a significant part of the text messages' substance in her police interview. Defendant counters that he never waived the privilege. (Evid. Code, § 912, subd. (b) ["a waiver of the right of one spouse to claim the privilege does not affect the right of the other spouse to claim the privilege."].) We need not jump into this fray because defendant does not demonstrate prejudice from the admission of the text messages.

Defendant argues that he was prejudiced in the same way he was prejudiced by ineffective assistance of counsel: "[T]here were significant problems with the prosecutor's proof that [he] was the gunman." As we have explained in the context of ineffective assistance of counsel, we disagree that there were problems with the proof of identity. It is true, as defendant mentions, that the prosecutor argued that the jury should construe the text messages against defendant as adoptive admissions. But, absent the adoptive admissions, the jury had evidence of three positive eyewitness identifications and an incredible alibi. Had the trial court excluded the text messages, it is not

---

[5] The trial court reasoned that defendant and Rodriguez had no expectation of privacy in text messages that they knew could be forwarded to third persons and were preserved by the phone company. It overlooked Evidence Code section 917, which provides that a communication does not lose its privileged character because it is electronic or other persons are involved in the delivery, facilitation, or storage of the communication.

15

reasonably probable that defendant would have obtained a more favorable verdict. (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 586.)

<u>PROSECUTORIAL MISCONDUCT</u>

One month before trial, Detective Morgan Chappell planted a listening device in Colby Isidro's prison cell. The device recorded Isidro telling his cellmate that he had shot Michael at the VGV party after Michael and a VGV member had fought. The trial court granted Isidro immunity, and the People proffered Isidro's testimony. At a hearing outside the jury's presence, defendant objected "to any hearsay, any rumor that was indicated in the jail recordings--a copy of the jail recordings that I received. In the copy of the jail recordings I received, there--the majority of it is rumor, um, except for there are areas where he specifically discusses what happened that night, the shooting. And then the remainder of it, he talked about, um, that he heard someone was looking for him and he--was looking for Green Eyes [Isidro's gang moniker] and that he had heard that this person had--had--had shot two other people. [¶] And so that would be my objection to any rumors, any hearsay from this witness; that this witness be limited to just what he did, what he saw, and what--uh, what he--just what he did and what he saw." The People replied that they intended to question Isidro about "that [Michael's] brother came looking for him, looking for Green Eyes" and that two days later on Holm Road "somebody walked up to somebody who was VGV, asked if that person was Green Eyes, and shot that person." The trial court declined to allow questioning about the shooting two days later. But, on the witness stand, Isidro refused to answer any questions. The trial court then allowed Detective Chappell to testify about the contents of the recording to impeach Isidro, and defendant renewed his hearsay objection. To this, the prosecutor offered the following: "My offer on the relevance of the remaining portion is I anticipate that the defense will argue that this wasn't a gang-motivated crime because they didn't advertise: They didn't wear the right colors, they didn't shout the right slogans, et cetera. [¶] The gang expert's testimony will be that word on the street gets out no matter what, and here

16

is direct evidence of that. Here is Colby Isidro saying he was aware of who did the shooting on Holm Road, who did the shooting on the basketball court, so it would tend to corroborate the gang expert's testimony." The trial court agreed: "None of what I'm ruling about here limits what the gang expert may rely on. I was just identifying particulars that were Colby Isidro's statements that were taped that you may impeach him with in [*sic*] his refusal to answer in any way. That's what I was ruling with my line identifications. [¶] This does not mean the gang expert can't rely on things. We all know the gang expert may consider hearsay, or other things, to inform his opinion which would not necessarily be directly admissible in front of the jury."

The prosecutor then examined Detective Chappell about Isidro's recorded statements. When he asked whether Isidro had talked to his cellmate about defendant returning and looking for Green Eyes, defendant objected and the trial court sustained the objection. The parties then had a sidebar conference during which the prosecutor explained that he was eliciting the evidence to support Detective Chappell's expert testimony rather than to impeach Isidro's testimony. Defendant then offered that he had "no problem with the court's ruling. However, it's sort of being mixed up, because we're--first we're talking about what [Isidro] says in regards to what happened, the shooting of Michael Escobar and his statements in the cell, and now we've switched over into the area of the gang--what the gang expert would testify to with regard to his--his-- well, gang evidence, and so the jury--I don't believe they're going to be able to separate that into that, as to the shooting itself and then the gang evidence." After the sidebar conference, the trial court instructed the jury as follows: "Ladies and gentlemen, I'm going to give you an instruction on how you may consider certain evidence, and do remember that you'll get a full set of instructions at the end, which will also give you guidance. [¶] There will be information that you will receive that Colby Isidro said certain things to his cellmate which were recorded surreptitiously. [¶] When Mr. Isidro appeared in front of you yesterday, he refused to answer specific questions, so you will

17

be allowed to hear what he said about particular things relating to this case, and that's considered a previous inconsistent statement with his testimony yesterday. [¶] And you can consider his statements to his cellmate, number one, for substantive evidence--that is, the truth of the matter stated therein--and, number two, for impeachment of what he did or did not say here in court, as you evaluate his credibility and decide what weight, if any, you choose to give to his statements both here in court and in his cell. [¶] Now, there is a second basis on which you may hear further information that's sometimes referred to as 'hearsay.' That information will not be offered for the truth of the matter asserted, but is information that the detective considers as he forms his opinion about whether or not a person is an active member of a criminal street gang and/or whether or not their activities were done to benefit the criminal street gang or in association with the criminal street gang." The prosecutor then asked the following questions and received the following answers.

"Q. Detective, not for the proof of the matter asserted, but just as it relates to your opinion, what, if anything, did Colby Isidro say about the shooting victim's brother coming back and looking for Green Eyes?

"A. He said that--he told his cellmate that the next day the victim's brother came back and killed some kid.

"Q. Did he say--and, again, not for the proof of the matter asserted, but just as it relates to your opinion, did he say anything specifically about the victim's brother looking for Green Eyes?

"A. Yes. He said that they had asked somebody about where Green Eyes was or who Green Eyes was. [¶] And then Colby tells his cellmate--he's like, 'Yeah, that's what they thought my'--'Like, that's what they thought my moniker was,' or 'That's who they thought I was 'cause I got green eyes.' [¶] And then he went on to say that he had shot two people.

"Q. Did he actually admit that 'Green Eyes' was his name?

18

"A. He said that--not in those words, but he said, 'They were looking for Green Eyes, like me; right?'

"Q. And later on--also not for the proof of the matter asserted, but just as it relates to your opinion--on page 60, did Colby Isidro talk more about the guy coming back, looking for him?

"A. Yes.

"Q. What exactly did he say?

"A. He said, 'So he was looking for me.' [¶] And his cellie asked if he had killed a couple of homies, and Isidro said he killed two homies. [¶] And Isidro goes on to say, 'He shot one of them. He shot one of them, like, eight times.' [¶] And then he's talking about a conversation that I was having with Colby. He goes back and forth--the conversation between his cellie, sometimes he's telling him about what he did, and then sometimes he's paraphrasing about my interview with him. [¶] And he said--so he's talking to his cellie about how he was just denying everything.

"Q. Did Colby Isidro also talk about how being charged with the shooting of Michael Escobar would improve his gang status?

"A. Yes.

"Q. What did he say?

"A. He said to his cellie--he's all, 'Well, I got my gangster card now; right?' [¶] And he said, 'See that? Now I've been linked to a homicide.' [¶] He was saying it in kind of a way like--almost like he was celebrating it. He said, 'Well, I got my gangster card. I've been linked to this homicide. Nobody on the yard can say that I'm not down for it.' [¶] And he and his cellie were going back and forth, sort of having a conversation about that he was a full-fledged, hardcore gangster now.

"[Q]. And, Your Honor, I neglected to preface that one by stating that the response was not for the proof of the matter asserted, but was also to Detective Chappell's opinion."

19

During Detective Chappell's later testimony, the following colloquy occurred.

"Q. Would it be logical to assume, if I'm a Salinas Casitas Norteno, that if I commit a crime--even though I'm not shouting out my gang name, I'm not wearing my colors--that other Norteno subsets are going to have the intelligence to figure out who's behind it?

"A. Um. Probably not the Watsonville ones. The only--you would really control that yourself. If you went back and told a bunch of people from Salinas that you did it, then it's going to get around. [¶] If you didn't tell anybody that you did it and you're not from Watsonville, chances are they're going to think it's Surenos.

"Q. But Colby Isidro knew?

"A. Colby Isidro did know.

"Q. So sometimes the intelligence will tell you who it is even if they might look like a Sureno gang member, for example?

"A. Correct.

"Q. And are you aware of cases where gang members have attempted to look like rival gang members in order to throw the police off?

"A. Yes.

"Q. Has that happened in Watsonville before?

"A. Um. I'm not sure if it's happened in Watsonville, but we hear that it happens a lot in Salinas. In talking to gang experts in Salinas, they say that that is becoming common practice down there.

"Q. And in the interview you did with Monique Rodriguez, did she tell you whether or not people on the street had approached her and told her whether or not they knew that [defendant] was responsible for the shooting?

"A. Yes.

"Q. Is that another example of how word on the--

"[Defendant's counsel]: Objection; hearsay.

20

"THE COURT:  Yes.  With respect to that, I have an instruction for [defendant's] jury: [¶] With respect to [defendant's] jury, you're going to strike that from your mind. You're not to consider it in any way.  You're not to give it any weight.  You're not to speculate upon this matter."

After Detective Chappell finished testifying, defendant unsuccessfully moved to strike the testimony "regarding statements of--of Mr. Isidro regarding the shooting, and specifically the statements that go to, 'This dude that shot me was looking'--'He was looking for the guy that shot his brother,' and then the other regarding--I believe it was on page 75, where he talks about, um, they weren't from the hood, they were in the hood, because I don't believe these statements were--would--there is no testimony that these statements helped the detective form his opinion that the shooting of Michael Escobar was done for the benefit of the gang."

Defendant contends that the prosecutor engaged in misconduct by twice eliciting from Detective Chappell that it was known on the street that defendant was the killer.  He summarizes as follows:  "[T]he first instance occurred during the testimony of Detective Chappell when the court permitted him to cite this evidence in support of his gang expert testimony.  The second occurred shortly afterwards, by way of prosecutorial misconduct, when the prosecutor solicited a double hearsay statement from Chappell's interview of Monique Rodriguez regarding rumors she had heard that [defendant] was the gunman." Defendant's analysis is erroneous.

The applicable standards regarding prosecutorial misconduct are well recognized. In order to preserve an issue on appeal, trial counsel must make a timely objection. (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)  The California Supreme Court has noted that "[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*Ibid*.)

21

Defendant objected to the People's line of questioning as hearsay and, later, as unsupportive of the expert's opinion. However, the standard set forth in *Samayoa* requires a more specific objection in order to preserve the issue of prosecutorial misconduct for appeal. Defendant has therefore forfeited his claim by his failure to properly identify the objection as prosecutorial misconduct and failing to request an admonition. Further, he does not specifically argue on appeal that an admonition would not have cured the harm and the record fails to disclose a basis for applying any exception to the general rule requiring both an objection and a request for a curative instruction.

Alternatively, defendant argues that if we conclude that his claim is forfeited, reversal nonetheless is required because trial counsel rendered ineffective assistance for failing to lodge a proper objection. We disagree.

Defendant bears a burden that is difficult to carry on direct appeal. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Our review is highly deferential; we must make every effort to avoid the distorting effects of hindsight and to evaluate the challenged conduct from counsel's perspective at the time. (*In re Jones* (1996) 13 Cal.4th 552, 561; *Strickland v. Washington*, *supra*, 466 U.S. at p. 689.) A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. (*Strickland v. Washington*, *supra*, at p. 689; *People v. Hart* (1999) 20 Cal.4th 546.) The burden is to establish the claim not as a matter of speculation but as a matter of demonstrable reality. (*People v. Garrison* (1966) 246 Cal.App.2d 343, 356.) As to the failure to object in particular, "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) This is the case especially when trial counsel might reasonably have concluded that an objection would be futile. (*People v. Price* (1991) 1 Cal.4th 324, 387.)

As we have noted, defendant's underlying claim is predicated on the theory that the prosecutor engaged in misconduct by placing "highly prejudicial evidence" before the jury. "Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct." (*People v. Scott* (1997) 15 Cal.4th 1188, 1218.) Thus, defendant's misconduct claim actually raises two questions: (1) was the evidence the prosecutor elicited inadmissible; and, if so, (2) did the prosecutor know the evidence was inadmissible at the time he sought to elicit it?

First, as to the Isidro hearsay, defendant concedes that "the [trial] court permitted [Detective Chappell] to cite this evidence in support of his gang expert testimony." Since the evidence is presumptively admissible to support the expert testimony (*People v. Hill*, *supra*, 191 Cal.App.4th at p. 1128), trial counsel could have reasonably refrained from objecting by concluding that the prosecutor did not engage in misconduct by eliciting the Isidro hearsay.

Second, as to the Rodriguez hearsay, the trial court struck Detective Chappell's response from the record and instructed the jury not to consider the stricken testimony. Because the response had been stricken from the record and it is presumed that the jury followed the trial court's instructions and disregarded the response (*People v. Sanchez* (2001) 26 Cal.4th 834, 852), trial counsel could have reasonably concluded that nothing more would be gained by also interjecting a prosecutorial-misconduct objection.

In short, defendant fails to demonstrate the deficient-performance prong of ineffective assistance of counsel. We add that defendant's argument as to the prejudice prong of ineffective assistance of counsel is grounded on the same identity-alibi theme that we have previously rejected.

## CUMULATIVE ERROR

Defendant contends that the cumulative effect of the four claimed errors was prejudicial. (See *People v. Hill* (1998) 17 Cal.4th 800, 844.) "A claim of cumulative error is in essence a due process claim and is often presented as such [citation]. 'The

23

"litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Rivas*, *supra*, 214 Cal.App.4th at p. 1436.)

Taking all of defendant's claims into account, we are satisfied that they received a fair adjudication. And we have rejected defendant's principle claim of evidentiary error. Defendant was "entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) His trial was fair beyond any doubt, although arguable, nonprejudicial errors did occur.

PAROLE REVOCATION FINE

The trial court imposed a suspended parole revocation fine upon defendant. Defendant contends that "This was error because [he] was sentenced to life without the possibility of parole." Defendant's analysis is erroneous.

Section 1202.45, subdivision (a) provides: "In every case where a person is convicted of a crime *and whose sentence includes a period of parole*, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (Italics added.) This additional parole revocation restitution fine shall be suspended unless the person's parole is revoked. (*Id.* subd. (c).)

" 'When there is no parole eligibility, the [parole eligibility] fine is clearly not applicable.' " (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1184, quoting *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) But, the above cases involved no determinate terms. Our Supreme Court has said, in a case involving a death sentence, as well as several determinate terms: "[Former] [s]ection 3000, subdivision (a)(1) provides that [a determinate term imposed under section 1170] 'shall include a period of parole.' [Former] [s]ection 1202.45, in turn, requires assessment of a parole revocation restitution fine '[i]n every case where a person is convicted of a crime and whose sentence includes

24

a period of parole.'  The fine was therefore required . . . . [¶] . . .  [D]efendant here is unlikely ever to serve any part of the parole period on his determinate sentence. Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine.  Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked."  (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075.)

Because the trial court also sentenced defendant to a determinate prison term for the gang participation count, the parole revocation fine was properly assessed.

## ABSTRACT OF JUDGMENT

In pronouncing judgment, the trial court ordered defendant to pay $7,500 to the State Victims Compensation Board on behalf of the murder victim.

Defendant contends that his abstract of judgment should be corrected to provide that his liability should be "joint and several" with codefendant Sandoval, who was convicted of second degree murder and also ordered to pay $7,500 to the board on behalf of the murder victim.  We decline to do so.

A trial court has discretion to order that codefendants share joint and several liability for victim restitution.  (*People v. Neely* (2009) 176 Cal.App.4th 787, 800.) Defendant cites no authority for the proposition that the trial court is required to impose joint and several liability.  He argues that the trial court erred by failing to do so here because such an order would have been appropriate "so as to prevent an unsupportable double recovery."  But the trial court could have rationally decided not to make a joint and several order because "Of course, each defendant is entitled to a credit for any actual payments by the other."  (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.)

25

## DISPOSITION

The judgment is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.

26